**VESUVIUS CRUCIBLE COMPANY,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

**No. 81–1171.**

United States Court of Appeals,
Third Circuit.

Argued Sept. 17, 1981.

Decided Nov. 30, 1981.

James Q. Harty, John E. Lyncheski (argued), James P. Hollihan, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for petitioner.

Paul J. Spielberg, Deputy Asst. Gen. Counsel, John P. Coyle (argued), William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Assoc. Gen. Counsel, Elliott Moore, Deputy Assoc. Gen. Counsel, N. L. R. B., Washington, D. C., for respondent.

Before SEITZ, Chief Judge, and ADAMS and GARTH, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

In this appeal, Vesuvius Crucible Company petitions for review of a final order of the National Labor Relations Board and the Board cross-petitions for enforcement of its order. The Board determined that the employer violated sections 8(a)(1) and (3) of the National Labor Relations Act when it refused to pay accrued vacation benefits to its striking employees. Because we conclude that there is insufficient evidence in the record to support the Board's decision, we grant the petition for review and decline to enforce the order.

### I.

Vesuvius Crucible Company is a steel manufacturer with a facility located in Swissvale, Pennsylvania. For many years, Local 3730 of the United Steelworkers Union has represented the company's production and maintenance employees. The two parties have executed a number of collective bargaining agreements; the agreement at issue in this case extended from November 2, 1973 to October 31, 1976.

During September and October of 1976, the union and the company began negotiations for a new collective bargaining contract. When no agreement was reached prior to the October 31, 1976 expiration

date; the union commenced a strike, which lasted until July 11, 1979.

On June 28, 1977, the union requested that the company pay accrued vacation benefits, based on work done for the ten months before the strike, to all eligible employees. The request, made pursuant to Section VII of the 1973–1976 agreement,[1] coincided with the customary date of the company's annual plant shutdown. At that time all eligible employees normally would have received at least a portion of their vacation pay, in accordance with the company's requirement that vacations be scheduled during the shutdown.

The company refused to grant the union's request. In a letter dated June 28, 1977, the company's counsel wrote to Caleb Scott, the union staff representative:

We have carefully reviewed Section VII of the 1973–76 Labor Agreement and have concluded that no vacation pay is yet due to any Vesuvius Bargaining Unit employee.

Section VII, B–1 reads as follows:

"1. An eligible employee who has attained the years of continuous service indicated in the following table in any calendar year, on the anniversary of his employment with the Company, during the term of this Agreement shall receive a vacation corresponding to such years of continuous service as shown in the following table: ..."

As we interpret this Section there was vacation due for the three years which constituted the "term of this agreement." Unless and until a new agreement is reached specifying terms and conditions for vacation during its term, I do not believe that any payment is required.

Joint Appendix at 225.

On September 13, 1977, the union filed a charge with the NLRB, alleging that the

refusal by Vesuvius to pay the vacation benefits in question violated sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3) (1976).[2] After the NLRB issued a complaint, Vesuvius moved for deferral to arbitration. It argued that the determination of the validity of the union's claim for vacation benefits involved the interpretation of the expired 1973–1976 collective bargaining agreement, and that the parties were bound by Section X of that agreement to arbitrate disputes concerning "the interpretation or application of, or compliance with, the provisions of this Agreement." The company's motion was denied.

After a hearing, the presiding administrative law judge found that vacation benefits had not accrued and that therefore Vesuvius had violated neither sections 8(a)(1) nor (3). In a footnote, the administrative law judge noted that a "similar conclusion follows from the conclusion that the vacation pay obligation, even if it could be said to have accrued, was impossible of calculation in the absence of a new agreement." Joint Appendix at 331–32.

The Board disagreed. Finding that the employees' right to 1977 vacation benefits had accrued on the basis of work performed in the first ten months of 1976, the Board concluded that the company had violated sections 8(a)(1) and (3) of the Act. It ordered Vesuvius to "cease and desist" from the unfair labor practices found; to grant accrued vacation pay, plus interest, in accordance with the 1973–1976 agreement, to those striking employees who had worked in 1976; to make its payroll records available to the Board for determination of amounts due; and to post appropriate notices.

After the Board denied the company's motion to reconsider its decision, Vesuvius

1. That section is reproduced as an Appendix to this opinion.

2. Sections 8(a)(1) and (3) provide that:
It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [29 U.S.C. § 157];

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization....

filed a petition[9] for review in this Court. Shortly thereafter, the Board filed a cross-petition for enforcement of its order.

## II.

In its brief filed with this Court, Vesuvius challenged both the merits of the NLRB decision and the failure of the Board to defer to arbitration. At oral argument, however, the parties informed the Court that vacation benefits for the time period in question eventually were awarded under the new 1979 contract. This effectively moots the deferral issue, as no arbitrable dispute now remains. We nonetheless are left with the question whether the refusal of the company to pay the benefits when they were first requested, in June of 1977, itself constituted an unfair labor practice under the Act.

Our analysis begins with the Supreme Court's decision in *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). There, the employer refused to pay vacation benefits to strikers—while continuing to pay such benefits to non-strikers—because it asserted "that all contractual obligations had been terminated by the strike and, therefore, none of the company's employees had a right to vacation pay." *Id.* at 29, 87 S.Ct. at 1795. The Court declared that this was "discrimination in its simplest form." *Id.* at 32, 87 S.Ct. at 1796. It then outlined the following principles:

First, if it can reasonably be concluded that the employer's discriminatory conduct was "inherently destructive" of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is "comparatively slight," an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the conduct. Thus, in either

situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him.

*Id.* at 34, 87 S.Ct. at 1798 (emphasis in original).

In *Great Dane*, the Supreme Court concluded that it was unnecessary to decide whether the discriminatory conduct was "inherently destructive" or "comparatively slight" because the company had come forward with *no* evidence of legitimate motives for its discriminatory conduct. The Supreme Court thus held that the employer's refusal to pay the benefits violated sections 8(a)(1) and (3).

This Court has had two occasions on which to apply the *Great Dane* doctrine to situations similar to the one at hand. In *NLRB v. Frick Co.*, 397 F.2d 956 (3d Cir. 1968), the company's vacation plan provided that "[n]o vacation or vacation pay will be allowed or paid to any person who is not on the payroll of the Company on Wednesday preceding the week in which vacation pay is distributed." 397 F.2d at 959. After the employees went on strike, Frick removed them from the payroll and then informed them that, unless they returned to the job for the three days preceding the day in which the vacation pay was to be distributed, their vacation pay would be forfeited. Frick argued that, in conditioning vacation benefits on the employees' presence at work, it was merely applying the same longstanding rule to the strikers that it would have applied to any other employee who was absent for an unauthorized or unexplained reason. We rejected Frick's contentions. Noting that Frick could have authorized the strikers' absences, but chose not to, Judge Biggs stated:

In the circumstances at bar it is undenied that Frick refused to pay vacation benefits to the strikers who were absent from work because of the strike when such benefits were paid to other employees.

This action is discriminatory on its face and the burden is on the company to demonstrate the nondiscriminatory and business reasons for such conduct.

*Id.* at 961.

Frick presented no evidence showing how the "unauthorized or unexplained" absence rule had been applied in the past, except for the statement of one management official "that it would apply to any employee." In addition, there was evidence that in demanding that its employees work for three days, rather than one, in order to be eligible for their vacation benefits, Frick was not strictly applying the company's vacation rule. For these reasons we concluded that Frick had not met its burden of justifying its conduct. *Id.* at 962 & n.13. Thus, under *Great Dane*, Frick was in violation of sections 8(a)(1) and (3); no showing of anti-union motivation was required. *Id.* at 963.

More recently, in *E. L. Wiegand Division v. NLRB*, 650 F.2d 463 (3d Cir. 1981), we faced once again the question whether an employer that withholds benefits from strikers has committed an unfair labor practice. There, however, our decision turned not on the validity of the employer's proffered business justifications but rather on the Board's finding of anti-union motivation. In *Wiegand*, the employer threatened that it would terminate disability payments to twenty-three employees then on sick leave if the union went on strike. When a strike was called, the employer carried out its threat, halting disability benefits to all the affected employees despite the fact that at least some of the disabled workers were not participating in the strike. The Board found, first, that the disability payments were accrued benefits rather than current wages, and second, "that these benefits were cut off by Wiegand with the intention of coercing and restraining protected union activity with respect to the strike through the imposition of a sanction against certain employees if other employees engaged in strike activity." 650 F.2d at 467. We con-

cluded that substantial evidence supported both of the Board's determinations.

## III.

The present case comes to us in a procedural posture more closely analogous to *Frick* than to *Wiegand*. Here, there has been *no finding of anti-union motivation*. After determining that the employees' benefits had accrued, the Board simply concluded that "[i]n refusing to grant their benefits in 1977 because the employees struck rather than worked that year, Respondent unlawfully penalized the strikers for exercising their protected right to strike." Joint Appendix at 358. Vesuvius construes this decision as a determination that the denial of benefits was "inherently destructive" of employee rights. Brief for Petitioner at 22. The Board clarified its position in its brief to this Court, explaining that it had "concluded that the Company had failed to show *any* 'legitimate and substantial' business justification for its conduct" and that "it was unnecessary for the Board to decide whether the denial of benefits had an 'inherently destructive' or 'comparatively slight' effect on employee rights." [3] Brief for the NLRB at 14–15 n.11.

We are, of course, mindful of the fact that "[i]t is the primary responsibility of the Board and not of the courts 'to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy.'" *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 546, 19 L.Ed.2d 614 (1967) (quoting *Great Dane*, 388 U.S. at 33–34, 87 S.Ct. at 1797–98). Nonetheless, we cannot agree with the Board's conclusion that Vesuvius failed to meet its burden of proving a legitimate motive for its conduct.

The company asserts that it refused to pay vacation benefits to its employees because of its "legitimate and good faith interpretation of the expired contract."

---

**3.** For purposes of this opinion, we adopt the Board's characterization of its own decision. We note, however, that regardless of how the decision is characterized, the result in this case remains the same.

Brief for Petitioner at 26 n.18. The NLRB found not that Vesuvius lacked bona fides but rather that its interpretation of the contract was incorrect. Specifically, the Board rejected the company's contention that the vacation benefits had not accrued because, under company policy, an employee had to perform some work in the year he or she was to take a vacation in order to receive the vacation benefits.[4] Additionally, the Board dismissed Vesuvius' assertion that the benefits were dependent on the contract and were expressly limited to the term of the contract. The company argued that, in the absence of a new agreement specifying the terms and conditions for vacation during its term—and in light of past practice—there was no basis on which to compute the amount of vacation pay owed. The Board responded: "the amount-of-vacation formula and the vacation pay formula were inseparably intertwined; once the employees' 1976 service had met the test for regular vacation entitlement, the terms of the 1973–1976 contract determined with equal finality how many weeks of vacation each employee would receive in 1977, and with how much vacation pay." Brief for the NLRB at 17.

We need not decide on this appeal whether Vesuvius, or the Board, correctly interpreted the collective bargaining agreement at issue here. Indeed, we believe that in formulating its own interpretation of the contract, the Board overstepped its authority and seriously misperceived its role. The legitimacy of the company's conduct for purposes of the analysis prescribed by *Great Dane* depends not on the truth of its assertions regarding its contractual obligations but rather on the reasonableness and bona fides with which it held its beliefs. The mere fact that the NLRB construed the contract differently from the way Vesuvius did should not, without more, mean that Vesuvius ipso facto committed an unfair labor practice.

The First Circuit's decision in *NLRB v. Borden, Inc., Borden Chemical Division*, 600 F.2d 313 (1st Cir. 1979), is persuasive in this regard. In *Borden*, the employer withheld accrued vacation pay because of the employees' strike activity until after the contractual vacation period had expired. The Board rejected the employer's assertion that it was acting pursuant to a contractual obligation, *i.e.*, "employees shall not be paid vacation pay in lieu of vacation," and concluded that the denial of vacation benefits was inherently destructive of the employees' rights. The First Circuit remanded the case, declaring:

> Borden did come forward with evidence of a business justification for its conduct, namely, the terms of the collective bargaining agreement and past practice.
>
> The Board found this reason invalid because its interpretation of the contract differed from that of Borden's. *This, however, is not a question of contract interpretation. The Board had a duty to determine whether Borden was motivated by its reliance on the collective bargaining agreement or by anti-union animus when it withheld the accrued vacation benefits. We caution the Board that it is neither our function nor the Board's to second-guess business decisions.* "The Act was not intended to guarantee that business decisions be *sound*, only that they not be the product of antiunion motivation" (emphasis in original). *Liberty Mutual Insurance Co. v. NLRB*, 592 F.2d 595, 603 (1st Cir. 1979), quoting from *Stone & Webster Engineering Corp. v. NLRB*, 536 F.2d 461, 467 (1st Cir. 1976). *See NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d 666 at 670, 673 (1st Cir. 1979).

600 F.2d at 321 (emphasis added).

Here, as in *Borden*, the employer came forward with evidence of a business justification for its conduct: it did not believe that any vacation benefits were due and payable under the expired contract on June 28, 1977. To resolve the dispute, Vesuvius offered to submit the matter to arbitration, but the Board effectively closed that avenue when it declined to defer to arbitration.

---

**4.** *See* note 6 *infra*.

The employer was then faced with a dilemma—it could either accede to the union's request for the vacation benefits, or it could refuse and run the risk that its refusal would be grounds for an unfair labor practice charge.

We find this result untenable. There is no suggestion that Vesuvius' interpretation of its contractual obligations was unreasonable or made in bad faith; indeed, the administrative law judge who heard the case agreed with the company's interpretation and concluded that the employees were not entitled to vacation pay on June 28, 1977. The company pointed to the language in the collective bargaining agreement stating that "[t]o be eligible for a vacation in any calendar year *during the term of this Agreement*, the employee must have one year or more of continuous service." § VII(A). Admittedly, this provision is ambiguous, but it is at least arguable that the phrase "during the term of this Agreement" refers not to vacation eligibility but to the vacation itself. Even more convincing is the company's argument that "in 1974, as in 1971, when new contracts were agreed upon, the vacation rights of the employees, were not determined under the predecessor expired agreements for 1970–73 and 1967–70, but under the new agreement then in effect which provided for different terms and conditions." Brief for Petitioner at 30. The Board dismissed this argument by noting: "That the parties agreed to compute 1974 vacations under the terms of the later contract does not rebut the fact that [the] employees earned vacation benefits in the year they performed the work." Joint Appendix at 357 n.17.

While we venture no opinion on the merit of the employer's contentions, we conclude that Vesuvius' construction of the contract, based both on the language of the vacation provision and on past practice, is reasonable

and at least arguably correct. Accordingly, we hold that, in the absence of proof of anti-union motivation or a finding that the company's conduct was inherently destructive of employee rights, a non-discriminatory refusal to pay benefits to all employees based on a good faith interpretation of the labor contract is insufficient to make out a violation of the National Labor Relations Act.[5]

*Frick* does not counsel otherwise. In that case, the employer conditioned the payment of vacation benefits on the employees' willingness to quit the strike and return to work; this directly violated the rule that "[s]trikers must be treated uniformly with nonstrikers with respect to whatever benefits accrue to the latter from the existence of the employment relationship." 397 F.2d at 962 (quoting *Great Dane Trailers*, 150 N.L.R.B. 438, 439 (1964), *rev'd sub nom. NLRB v. Great Dane Trailers, Inc.*, 363 F.2d 130 (5th Cir. 1966), *rev'd*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967)). Here, in contrast, the employer argued that no benefits had accrued to any employee— striking or non-striking—under the expired contract.

Nor are we persuaded that cases such as *NLRB v. Duncan Foundry and Machine Works, Inc.*, 435 F.2d 612 (7th Cir. 1970), and *NLRB v. Knuth Brothers, Inc.*, 584 F.2d 813 (7th Cir. 1978), compel a different result. In *Duncan Foundry*, the employer argued that, under the contract, only those employees who had been working on May 1, 1967 were entitled to vacation pay. Similarly, the employer in *Knuth Brothers* pointed to a provision in its collective bargaining agreement requiring that "an employee must be on the 'active payroll' on March 1 to be entitled to any vacation benefits for the previous 12 months," and argued that *no vacation benefits were due* to striking employees not present at work

---

**5.** The mere fact that the employer has treated all of its employees alike will not, of course, legitimize otherwise illegal conduct under sections 8(a)(1) and (3). It is well settled that an employer may not defend inherently destructive or improperly motivated conduct on the ground that it did not discriminate against one

group of employees. *See Kansas City Power & Light Co. v. NLRB*, 641 F.2d 553, 556–57 (8th Cir. 1981); *Allied Industrial Workers, Local 289 v. NLRB*, 476 F.2d 868, 877 (D.C.Cir.1973); *NLRB v. Jemco, Inc.*, 465 F.2d 1148, 1152 (6th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 911, 34 L.Ed.2d 690 (1973).

on March 1. In both cases, "the effect of the alleged active work rule [was] to deny strikers vacation benefits while granting such benefits to nonstrikers and strikers who returned before the end of the strike." *Duncan Foundry*, 435 F.2d at 618. Thus, the work rule—cited by the employer as a business justification for its conduct—was itself discriminatory in effect, and could not be applied by the employer absent a legitimate and substantial business justification for its use. In the case at hand, in contrast, there was no suggestion that the contractual provisions relied upon by the employer worked to entice the strikers back to work or to favor those employees who chose not to strike. Here, Vesuvius' asserted justification for its conduct—its good faith belief that no vacation benefits were due to any employee under the expired contract—was not itself discriminatory in effect.[6] We conclude, therefore, that Vesuvius met its burden, under *Great Dane*, of showing a legitimate and substantial business justification for its conduct.

## IV.

Our inquiry is not ended by concluding that Vesuvius has met its burden of establishing a legitimate and substantial business justification for its conduct. We now must address the question, unanswered by the Board in this case, whether the company's conduct was "inherently destructive" of the employees' rights or whether the adverse consequences were "comparatively slight." [7]

If the conduct properly can be characterized as "inherently destructive," no proof of anti-union motivation is required; the Board can find an unfair labor practice despite the employer's proof of legitimate business justifications. If, however, the effects of the conduct are less severe, anti-union animus must be shown to sustain the unfair labor practice charge.

## A.

■ The Supreme Court has stated that conduct is inherently destructive if it "carries with it 'unavoidable consequences which the employer not only foresaw but which he must have intended' and thus bears 'its own indicia of intent.'" *Great Dane, supra*, 388 U.S. at 33, 87 S.Ct. at 1797 (quoting *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 228, 231, 83 S.Ct. 1139, 1145, 1147, 10 L.Ed.2d 308 (1963)). Generally, those courts that have addressed the question have described "inherently destructive" conduct as that "with far reaching effects which would hinder future bargaining, or conduct which discriminates solely upon the basis of participation in strikes or union activity." *Portland Willamette Co. v. NLRB*, 534 F.2d 1331, 1334 (9th Cir. 1976). Put another way, "inherently destructive" conduct is "that which creates visible and continuing obstacles to the future exercise of employee rights." *Inter-Collegiate Press, Graphic Arts Division v. NLRB*, 486 F.2d 837, 845 (8th Cir. 1973) (citing Note, *Lockouts—Employers' Lockout with Tem-*

---

**6.** The Board's decision that Vesuvius had committed an unfair labor practice rested in large measure on its finding that Vesuvius had "refused to grant vacation benefits to the strikers because, as a result of their strike, they were absent from work in 1977." Joint Appendix at 353. Indeed, Vesuvius does argue vigorously that "it is an established practice under the agreement that in order for an employee to be eligible for or entitled to vacation in a calendar year he must perform some work in that calendar year." Brief for Petitioner at 32. Had it been shown that any employee who abandoned the strike and worked for at least one day in 1977 received vacation benefits, while those who remained on the picket line forfeited their benefits, we might be constrained, under *Frick*, to hold that Vesuvius had not presented a legitimate business justification for its conduct.

There was, however, no evidence to this effect. In fact, the record suggests that—notwithstanding its ex post facto legal arguments—Vesuvius' primary contention when it refused to grant the vacation benefits was that, whether or not the employees worked in 1977, under section VII(B)(1) of the contract, vacation pay was due only for the three years that constituted the term of the collective bargaining agreement. Joint Appendix at 225.

**7.** Because we conclude that there is insufficient evidence on the record to support either a determination that the company's conduct was "inherently destructive" or a finding of anti-union motivation, we find it unnecessary to remand the case to the Board in this instance.

porary *Replacements Is an Unfair Labor Practice*, 85 Harv.L.Rev. 680, 686 (1972)), *cert. denied*, 416 U.S. 938, 94 S.Ct. 1939, 40 L.Ed.2d 288 (1974).

■ There is no evidence in the record to support a conclusion that Vesuvius' refusal to pay vacation benefits in June 1977 was "inherently destructive," as that phrase has been defined. This is not a case in which the employer offered to non-strikers a benefit, such as super-seniority, that necessarily and permanently worked to the detriment of the strikers. *See NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 230–31, 83 S.Ct. 1139, 1146–47, 10 L.Ed.2d 308 (1963). Nor are we faced with the situation in which workers were permanently discharged because of their participation in collective action. *See Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); *cf. Radio Officers' Union v. NLRB*, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954). Here, payment of the vacation benefits was made contingent not on the strikers' return to work but rather on the resolution of a dispute regarding the contractual obligation of the employer to pay the very benefits in question. In no way can it be said that this conduct bears its own indicia of improper intent. *See NLRB v. Borden, Inc., supra* at 321. Consequently, actual proof of anti-union motivation would be necessary to sustain the Board's determination that Vesuvius committed an unfair labor practice in this case.

### B.

■ Under the law of this Circuit, it is unnecessary for the Board to prove that the employer's conduct was motivated *solely* by anti-union animus. *NLRB v. Garry Manufacturing Co.*, 630 F.2d 934, 945 (3d Cir. 1980); *Gould Inc. v. NLRB*, 612 F.2d 728, 734 (3d Cir.), *cert. denied*, 449 U.S. 890, 101 S.Ct. 247, 66 L.Ed.2d 15 (1980); *Edgewood Nursing Center, Inc. v. NLRB*, 581 F.2d 363, 368 (3d Cir. 1978). Nonetheless, a finding of anti-union motivation cannot be sustained unless there exists some specific evidence demonstrating that the employer intended, at least in part, to interfere with the employees' rights by withholding benefits.

A careful review of the record in this case reveals no evidence of anti-union motivation on the part of Vesuvius. There is no suggestion, for example, that Vesuvius conditioned the payment of benefits on a requirement that its striking employees return to work; indeed, the evidence suggests that one employee who abandoned the strike and returned to work did not receive vacation benefits in 1977. Joint Appendix at 199. *Cf. NLRB v. Frick Co., supra* (employer notified employees that if they failed to return to work, they would forfeit their vacation benefits); *NLRB v. Duncan Foundry & Machine Works, Inc., supra* (employer granted vacation benefits to non-strikers and strikers who abandoned the strike); *Allied Industrial Workers, Local 289 v. NLRB*, 476 F.2d 868 (D.C.Cir.1973) (employer conditioned payment of accrued vacation benefits upon cessation of strike). Additionally, it is uncontroverted that in January, 1977, the company paid vacation pay to those employees who had scheduled vacations in November or December of 1976 but were on strike as of those dates. No attempt was made to deprive these employees of their accrued benefits merely because they were on strike. Nor does the record indicate that Vesuvius threatened to withhold the benefits prior to the strike in order to gain concessions from the union. *See Wiegand, supra*, at 470 n.3. Finally, Vesuvius expressed willingness to submit the question of 1977 vacation pay to an arbitrator. No evidence suggests that, had the dispute been arbitrated, and had the arbitrator found in favor of the employees, Vesuvius nonetheless would have refused to pay the benefits to those employees who remained on strike.

In short, we conclude that there is insufficient evidence on this record to support a conclusion that Vesuvius was motivated by anything other than its good faith belief that no right to vacation pay had accrued to its employees as of June 1977, and that entitlement to and amount of the 1977 benefits would be determined under the new

collective bargaining agreement if and when that agreement was signed. Accordingly, we find it unnecessary to remand the case to the Board for a determination whether Vesuvius' conduct was improperly motivated.

Thus, the Board's petition for enforcement will be denied, and the company's petition for review will be granted.

## APPENDIX

*SECTION VII. VACATIONS*

A. *Eligibility*—To be eligible for a vacation in any calendar year during the term of this Agreement, the employee must have one year or more of continuous service.

B. *Length of Vacation and Extra Vacation Pay*

1. An eligible employee who has attained the years of continuous service indicated in the following table in any calendar year, on the anniversary of his employment with the Company, during the term of this Agreement shall receive a vacation corresponding to such years of continuous service as shown in the following table:

| Years of Service | Vacation |
|---|---|
| 1 but less than 3 | 1 week |
| 3 but less than 10 | 2 weeks |
| 10 but less than 15 | 3 weeks |
| 15 but less than 25 | 4 weeks |
| 25 or more | 5 weeks |

2. A one week's vacation shall consist of seven consecutive days, a two weeks' vacation of fourteen consecutive days, and a three weeks' vacation of twenty-one consecutive days, etc., provided however that in the event the orderly operations of the business require, such vacations shall be subject to the provisions of the following Subsection C.

C. *Scheduling of Vacation*—Promptly after January 1 of each calendar year each eligible employee shall be requested to specify the vacation period he desires. Vacations will, so far as possible, be granted at times most desired by employees (longer service employees being given preference as to choice), but the final right to allot vacation period, and the right to change such allotments, is exclusively reserved to the Company in order to insure the orderly operation of the business.

1. Vacation season shall be from January 1 to December 31.

2. Vacation dates must necessarily conform to business requirements and shall be taken as scheduled by Management.

3. Vacation schedules may be changed by the Company if operating conditions make such change necessary.

4. A temporary shutdown in any department may be designated for vacations upon reasonable notice by the Management.

5. Excepting conditions listed above, whenever a Company scheduled vacation shutdown is planned, unless he is otherwise notified, such employee will take his earned vacation at shutdown time. Those employees who are due more than two weeks' vacation are required to take only two weeks of their earned vacation at shutdown time, providing the remaining vacation is taken as provided for above. All vacations must be taken by December 31 in any year. There shall be no pyramiding or carryover into subsequent years of vacation earned but not taken by an employee.

D. *Vacation Pay*—An employee granted a vacation will receive, for each vacation week, two percent (2%) of his earnings from January 1 to December 31 of the year previous. In the case of first year's employment, he will receive two percent (2%) of the first twelve (12) months' earnings. Vacation pay shall be shown separately on the employees' earnings.

Earnings are defined as all money received within the prescribed period except that money received for holiday pay, jury duty pay, cost-of-living adjustment, and death in family pay shall be excluded from the total earnings for computing vacation pay.

When an employee has been off from work for reasons of his ill health (but for no other reason) for more than one-half of the number of available working days between January 1 of any year and the subsequent December 31, such employee's vacation benefits shall be calculated as follows: (a) an employee having no earnings between Jan-

uary 1 of any year and the subsequent December 31 shall be entitled to a minimum of one week or one-half of his accumulated vacation benefits based on his basic hourly wage rate, and (b) in determining the amount of vacation pay, the two percent (2%) of his average hourly earnings between January 1 and the subsequent December 31 will be used. In such event, if this calculation (b) is less than the minimum defined above in (a), the employee shall receive the greater of the two calculations.

In the event employment is terminated between January 1 and July for the following reason:

Quit, provided two weeks' prior notice of such intent is given the Payroll Office in writing, the employee shall receive for each eligible week two percent (2%) times his earnings for the last four (4) consecutive closed quarters of work.

E. *Vacation Allowance in Lieu of Vacation*—While it is recognized that the purpose of the vacation provided by this Section is to grant the employees vacation with pay as annual periods of rest and recreation, the Company may require an employee to work during his vacation, in which event he shall be paid his vacation pay in addition to his regular pay.