NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

SHERWIN–WILLIAMS COMPANY, Respondent.

No. 82–8441.

United States Court of Appeals, Eleventh Circuit.

Sept. 16, 1983.

Elliott Moore, Deputy Asst. Gen. Counsel, Washington, D.C., William L. Hazelton, Atlanta, Ga., for petitioner.

John W. Wilcox, Jr., Atlanta, Ga., for respondent.

Before TJOFLAT, FAY and ANDERSON, Circuit Judges.

FAY, Circuit Judge:

The National Labor Relations Board (the "Board") petitions for enforcement of its Decision and Order of March 30, 1982, 260 N.L.R.B. No. 185 (the "Order"), pursuant to Section 10(e) of the National Labor Relations Act (the "Act"), as amended, 29 U.S.C. § 160(e).[1] The Board, affirming the rul-

---

**1.** Section 10(e) of the Act states in relevant part:

The Board shall have power to petition any court of appeals of the United States ... within any circuit ... wherein the unfair

labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining

ings, findings, and conclusions of the administrative law judge, and adopting his recommended order, found that respondent Sherwin-Williams Company ("Sherwin-Williams" or "Company") had violated Section 8(a)(3) and (1) of the Act, by withholding disability benefit payments to certain named employees after a strike had occurred at one of its plant facilities; the Board also found that the Company had violated Sections 8(a)(5) and (1) of the Act by withholding holiday pay from a certain employee for five named holidays. Because we conclude that there is insufficient evidence in the record to support the Board's determinations, we set aside the Board's Order and decline to enforce it.

## FACTS

Since 1967, the Local 1961, Brotherhood of Painters and Allied Trades (the "Union") and the Teamsters Union [2] have jointly represented the production and warehouse employees at Sherwin-Williams' paint manufacturing plant in Morrow, Georgia. The Union represented the production employees and the Teamsters represented the warehouse employees. There have been numerous collective bargaining agreements jointly entered into between the two Unions and the Company, and there have been numerous strikes upon the expiration of those agreements. As of October 25, 1976, the two Unions and the Company entered into an agreement covering all wages, hours and working conditions of the Morrow employees; the contract continued until midnight of October 24, 1979. Prior to the expiration of the contract, dated October 25, 1976, the parties entered into negotiations for a new contract. Immediately prior to the expiration of the 1976 contract, the Teamsters and the Company agreed to extend the contract for at least two days after October 24, 1979. However, after a membership vote, the Union rejected an extension, and the contract expired in accordance with its terms. Thereafter, the

order, and shall file in the court the record in the proceedings . . .

Union notified the Company that they were on strike and placed pickets around the Company's Morrow facility at approximately 3:00 A.M. on October 25, 1979. The Teamsters Union notified Sherwin-Williams that they would not strike. The Teamsters Union did respect the picket line of the Union and there was no work performed by production or warehouse employees from October 25, 1979 through January 3, 1980.

On the morning of October 25, 1979, at approximately 9:00 A.M., the two Unions and the Company met in a previously scheduled negotiation session. During this meeting, the Company advised the two Unions that the benefits under the expired contract would cease at certain times. Specifically as to disability, the chief spokesman of the Company advised the two Unions that under the provisions of the Disability Plan, disability benefits would cease effective October 25, 1979. There is a conflict as to whether there was any protest to the Company's statement regarding cessation of benefits. In all prior work stoppages at the Morrow plant, and other plants of the Company having the same Disability Plan, no disability payments had been made to employees on disability where a work stoppage had occurred. Various negotiation sessions were held between the two Unions and the Company, commencing October 25, 1979 through the end of the strike on January 4, 1980, when a new agreement was reached.

In April 1979, employee Roy Odum sustained a job related injury to the cartilage in his knee and as a result was absent from work for an extended period of time. At the commencement of the strike, Odum's disability benefits were exhausted, but he was still disabled from returning to work. While disabled, prior to the strike, he received pay for any regular holiday that came due. After the strike commenced, while Odum was still disabled, the Company ceased paying him for regular holidays as set forth in the collective bargaining agreement between the parties.

2. General Teamsters Local Union No. 528, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

On January 11, 1980, the Union filed a charge with the Regional Director of the Board for the 10th Region. The Complaint alleged that the Company violated Section 8(a)(3) and (1) of the Act by withholding disability benefit payments to certain named employees, after a strike had occurred at the Company's Morrow, Georgia facility. On April 18, 1980, the Union filed a second charge with the Regional Director, alleging that the Company violated Sections 8(a)(1) and (5) of the Act by withholding holiday pay from employee Roy Odum for five named holidays. The two complaints were consolidated and a hearing was held before the administrative law judge on July 15, 1980. Thereafter, on October 7, 1980, the administrative law judge issued his Recommended Decision and Order, finding the Company in violation of all matters in the consolidated complaints. On October 28, 1980, the Company filed its exception to the Decision and Recommended Order of the administrative law judge. On March 30, 1982, the Board issued its Order, affirming the rulings, findings and conclusions of the administrative law judge and adopting his recommended order. On or about July 12, 1982, the Board filed its petition for enforcement of its Order pursuant to Section 10(e) of the Act, thereby placing the issues before the court.

## DISCUSSION

### I. Disability Payments

██ The Board's determination that Sherwin-Williams committed an unfair labor practice was based on its finding that the Company's termination of disability benefits was unlawfully intended to coerce and restrain protected union activity with respect to the strike, through the imposition of a sanction against certain employees if other employees engaged in strike activity. After a careful review of the record, however, we conclude that there is insufficient evidence to support the Board's finding that the Company was unlawfully motivated in depriving disabled employees of disability pay because other active employees struck.[3]

Under Section 8(a)(3) of the Act, it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment to encourage or discourage membership in any labor organization." In *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 233, 83 S.Ct. 1139, 1148, 10 L.Ed.2d 308 (1963), the United States Supreme Court held that discouraging membership in a labor organization under Section 8(a)(3) includes discouraging participation in concerted activities, such as a legitimate strike. The Supreme Court elucidated the standard of proof necessary where a Section 8(a)(3) violation has been charged in *NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). There, the employer refused to pay vacation benefits to strikers—while continuing to pay such benefits to non-strikers—because it maintained "that all contractual obligations had been terminated by the strike and,

---

**3.** The role of this court in reviewing the Order of the Board is to determine whether the Board's decision is supported by substantial evidence on the record as a whole. *Johns-Manville Products Corp. v. NLRB,* 557 F.2d 1126, 1132 (5th Cir.1977). "This [c]ourt has the utmost respect for findings and conclusions of the Board, but recognizes that their judgment is not the last word." *Id.* As the Supreme Court stated in *NLRB v. Brown,* 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965):

It is argued, finally, that the Board's decision is within the area of its expert judgment and that, in setting it aside, the Court of Appeals exceed the authorized scope of judicial review. This proposition rests upon our statement in *Buffalo Linen* [*Labor Board v. Truck Drivers Union,* 353 U.S. 87, 77 S.Ct. 643, 1

L.Ed.2d 676 (1957)] that in reconciling the conflicting interests of labor and management the Board's determination is to be subjected to 'limited judicial review.' 353 U.S., at 96 [77 S.Ct. 643]. When we used the phrase 'limited judicial review' we did not mean that the balance struck by the Board is immune from judicial examination and reversal in proper cases. Courts are expressly empowered to enforce, modify or set aside, in whole or in part, the Board's orders, except that the findings of the Board with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. National Labor Relations Act, as amended, §§ 10(e), (f), 29 U.S.C. §§ 160(e), (f).....

therefore, none of the company's employees had a right to vacation pay." *Id.* at 29, 87 S.Ct. at 1795. The Court held that this was "discrimination in its simplest form." *Id.* at 32, 87 S.Ct. at 1796. It then outlined the following standard of proof:

> First, if it can reasonably be concluded that the employer's discriminatory conduct was "inherently destructive" of important employee rights, no proof of an anti-union motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is "comparatively slight," an anti-union motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the conduct. Thus, in either situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him.

*Id.* at 34, 87 S.Ct. at 1798 (emphasis in original).

In *Great Dane,* the Supreme Court concluded that it was unnecessary to decide whether the discriminatory conduct was "inherently destructive" or "comparatively slight" because the company did not come forward with any evidence of legitimate motives for its discriminatory conduct. The Supreme Court thus held that the employer's refusal to pay the benefits violated Section 8(a)(1) and (3) of the Act.

In the instant case, however, Sherwin-Williams did come forward with evidence of a business justification for its conduct, which showed that the cessation of disability benefits at the time of the strike was based on the terms of the Disability Plan and on the prior practice of the Company where previous strikes had occurred. Notwithstanding this asserted business reason, the Board determined that the suspension of disability benefits by the Company was intended to coerce and restrain protected union activities by imposing a sanction against certain unit employees if other employees in the unit engaged in a strike. The Board explicated its determination in its brief to this court, stating that "in finding that the Company's motive was to stifle protected activity, the Board, in effect, found that the Company had no legitimate business justification." Brief for the NLRB at 16. It further states, "since the Board properly found that the Company's intent was to restrain and coerce protected strike activity, it was unnecessary to reach the question of whether the conduct was inherently discriminatory or to balance the resulting interference with employee rights against the employer's asserted business justification for its action." *Id.*

We are, of course, mindful of the fact that "[i]t is the primary responsibility of the Board and not the court's 'to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy.'" *NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 378, 88 S.Ct. 543, 546, 19 L.Ed.2d 614 (1967), (*quoting Great Dane,* 388 U.S. at 33–34, 87 S.Ct. at 1797–98). Nonetheless, we cannot agree with the Board's conclusion that Sherwin-Williams failed to meet its burden of proving a legitimate motive for its conduct.

Sherwin-Williams maintains that the suspension of disability benefits from October 25, 1979 through January 3, 1980, was based upon the Disability Plan itself and on its prior practice of discontinuing disability benefits during work stoppages. The disability benefits, which are the subject of the alleged Section 8(a)(3) and (1) violation are controlled by the Disability Plan. This plan provides in part:

> (11) BENEFITS DURING DISABILITY
> "... Benefits equivalent to half pay will be one-half of the amount determined to be equivalent to full pay, and will normally be computed by taking one-half of the number of hours the employee would

reasonably have been expected to have worked during the disability period..."

(22) LAY–OFF, SHUT–DOWN OR REDUCED HOURS

"In keeping with the provision 'employees are to receive benefits only for the time they would reasonably be expected to work,' Disability Benefits will not be paid after the effective date of a scheduled lay-off of an individual. When a department is to be shut down, Disability Benefits will not be paid after the effective date of the shut down. In the event of reduced hours, the amount of Disability Benefits to be paid an employee will be based upon the number of hours that he would normally be expected to work in his department or group."

(Exhibit 3 of the General Counsel of the Board, pp. 4, 11).

Further, the collective bargaining agreement between the parties, which expired on October 24, 1979, provided that there would be no "vested rights" under the Disability Plan. (Exhibit 2 of the General Counsel of the Board, p. 39, para. 61).

The evidence of record reveals that at a negotiating meeting on the morning of October 25, 1979, the Company advised the Union officials that under the provisions of the Disability Plan, and consistent with its past practice where strikes had occurred at the Morrow, Georgia facility, all disability benefits would cease effective October 25, 1979.

On appeal, the Company argues that the disabled employees were ineligible for benefits under the Disability Plan because the employees' departments were closed down from October 25, 1979 through January 3, 1980, and they therefore could not reasonably be expected to be employed but for their respective disability. In support of its Order, the Board essentially counter-argues that the Company could not lawfully take advantage of the "shut down" clause contained in the Disability Plan because the Morrow plant was operating during the strike. Brief of the NLRB at 18. After a careful review of the record, we find no evidence to support the Board's assertion

that the plant was operating from October 25, 1979 to January 3, 1980. Rather, the evidence of record reveals that the plant was shut down during the strike period. Although there is evidence that two salaried employees went back to work on January 2, just prior to the signing of the new labor agreement, the evidence is overwhelming that there was complete disruption of work both in the production area and the warehouse area at the Morrow plant during the entire strike period. Further, there is no evidence of any salaried employees, at the inception of the strike or during the strike, attempting to cross the picket lines in an effort to return to work. Nor is there any evidence of salaried, non-union employees doing any work during the strike in any department where the disabled employees worked. In short, on this record, we conclude that the Morrow plant was effectively shut down under the terms of the Disability Plan during the entire strike period. Thus Sherwin-Williams' refusal to pay disability benefits to disabled employees during a work stoppage at the Morrow plant, based both on the language of the Disability Plan and on its past practice, was proper and fully justified. Even counsel for the Board conceded at oral argument that if the Morrow plant was shut down during the strike there would be no violation of the Act.

■ Proceeding with the *Great Dane* analysis, if the conduct itself can be characterized as "inherently destructive," no proof of anti-union motivation is required; the Board can find an unfair labor practice despite the employer's proof of legitimate business justifications. If, however, the effects of the conduct are less severe, anti-union animus must be shown to sustain the unfair labor practice charge.

The Supreme Court has stated that conduct is "inherently destructive" if it "carries with it 'unavoidable consequences which the employer not only foresaw but which he must have intended' and thus bears 'its own indicia of intent.'" *Great Dane,* 388 U.S. at 33, 87 S.Ct. at 1797, *quoting NLRB v. Erie Resistor Corp.,* 373

U.S. 221, 228, 231, 83 S.Ct. 1139, 1145, 1147, 10 L.Ed.2d 308 (1963). "Generally, those courts that have addressed the question have described 'inherently destructive' conduct as that 'with far reaching effects which would hinder future bargaining, or conduct which discriminated solely upon the basis of participating in strikes or union activity.'" *Vesuvius Crucible Co. v. NLRB,* 668 F.2d 162, 169 (3rd Cir.1981), *quoting Portland Wiliamette Co. v. NLRB,* 534 F.2d 1331, 1334 (9th Cir.1976).

There is simply no evidence in the record to support a conclusion that Sherwin-Williams' refusal to pay disability benefits from October 25, 1979 to January 3, 1980 was "inherently destructive," as that phrase has been defined. It is uncontroverted that Sherwin-Williams has a historical practice of suspending disability benefits during work stoppages.[4] Yet, there is no evidence in the record that shows that in the past this practice hindered future bargaining or created continuing obstacles to the future exercise of the Company's employees' rights. *Inter-Collegiate Press, Graphic Arts Division v. NLRB,* 486 F.2d 837, 845 (8th Cir.1973). Indeed, there is no evidence that any of the strikers were influenced in the slightest, in deciding to strike on October 25, 1979, by the Company's continuation of its past practice of suspending disability benefits during work stoppages. Absent some evidence, it cannot be said that the cessation of disability benefits to disabled employees during the work stoppage at the Morrow plant bears its own indicia of improper intent. Consequently, actual proof of anti-union motivation would be necessary to sustain the Board's determination that Sherwin-Williams committed an unfair labor practice in this case.

A careful review of this record reveals no evidence of anti-union motivation on the part of Sherwin-Williams. There is no suggestion, for example, that the Company conditioned the payment of benefits on a requirement that the disabled named employees herein express their non-support for the strike; indeed, the uncontradicted evidence shows that five members of the Teamsters Union, who did not strike, did not receive disability benefits during the strike period. Nor does the record indicate that Sherwin-Williams threatened to withhold the benefits prior to the strike in order to gain concessions from the Union. *See E.L. Wiegand Division, Emerson Electric Company v. NLRB,* 650 F.2d 463, 470 n. 3 (3rd Cir.1981).[5] In short, we conclude that there is insufficient evidence on this record to support a conclusion that Sherwin-Williams was motivated by anything other than its good faith and reasonable interpretation of the Disability Plan when it, consistent with past practice, suspended disability benefits during work stoppages at the Morrow, Georgia facility. The Board's determination that the Company committed an unfair labor practice by withholding disability benefits from the named employees cannot be sustained.[6]

4. Counsel for the Company stated during oral argument that since the inception of contract negotiations in 1967 between the Union and the Company there has been a practice of terminating disability benefits when a work stoppage occurred at the Morrow, Georgia facility. Specifically, the Company invoked this practice when the Union engaged in an economic strike at the Morrow plant in 1970 and 1973. Also, the practice was invoked in 1969 and 1970 during two wildcat strikes at the plant.

5. In *Wiegand,* a case heavily relied upon by the administrative law judge and the Board in reaching their decision, the Third Circuit was faced with the question whether an employer that withholds benefits from strikers has committed an unfair labor practice. As explained by the Third Circuit in its later decision in

*Vesuvius Crucible Company v. NLRB,* 668 F.2d 162 (3rd Cir.1981), the court's decision in *Wiegand* turned not on business justification, but on the fact that the Board found anti-union motivation in the employer's threat prior to a strike to withhold disability benefits from persons on disability if a strike occurred, and then after the strike carrying out its threat. *Vesuvius* at 166.

6. In its Order, the Board did not address the question whether Sherwin-Williams' conduct was "inherently destructive" of the employees' rights or whether the adverse consequences were "comparatively slight." Because we conclude that there is insufficient evidence on the record to support either a determination that the Company's conduct was "inherently de-

## II. Holiday Benefits

The Board determined that Sherwin-Williams violated Section 8(a)(5) and (1) of the Act; it found that the Company unilaterally changed employee benefits by withholding holiday pay from its employee Roy Odum during the strike period.

■ An employer violates Section 8(a)(5) of the Act by making unilateral changes in working conditions simply because the collective bargaining agreement has expired. For the "spirit of the National Labor Relations Act and the more persuasive authorities stand for the proposition that even after expiration of a collective bargaining contract, an employer is under an obligation to bargain with the Union before he may permissibly make any unilateral change *in those terms and conditions of employment comprising mandatory bargaining subjects within the meaning of § 8(d) of the Act.*" *Hinson v. NLRB,* 428 F.2d 133, 137 (8th Cir.1970) (emphasis in original); *Accord, NLRB v. SAC Construction Co., Inc.,* 603 F.2d 1155, 1157 (5th Cir.1979).

In the instant case, the expired labor agreement provided:

> Where an employee who is otherwise eligible for holiday pay is absent due to an industrial accident, he shall receive holiday pay.

(Exhibit 2 of the General Counsel for the Board, p. 15, Sec. 18).

■ This benefit is a mandatory subject of collective bargaining under Section 8(d) of the Act, and to withhold, discontinue, or cancel this benefit, after the expiration of a contract, without giving the union the opportunity to object and bargain on the subject would violate Section 8(a)(5) of the Act. *NLRB v. Cone Mills Corporation,* 373 F.2d 595, 598 (4th Cir.1967). An employer, however, has the right to withdraw benefits provided under an expired collective bargaining agreement where the representatives of the employees have an opportunity to bargain regarding such withdraw-

structive" or a finding of anti-union motivation, we find it unnecessary to remand the case to

al. *Id.* As the former fifth circuit stated in *NLRB v. J.P. Stevens & Co., Inc.,* 538 F.2d 1152, 1162 (5th Cir.1976):

> The employer's power to alter working conditions in his plant is not contingent upon union agreement with his proposed change. The company has only to notify the union before effecting the change so as to give the union a meaningful chance to offer counter-proposals and counter-arguments.

■ The Board here, in adopting the decision of the administrative law judge, found that the Union had no such opportunity to bargain as to the withholding of holiday pay to employee Odum, who was not working immediately prior to the work stoppage because of an industrial accident. After carefully reviewing the record, however, we conclude that the Board's finding that the Union was not afforded an opportunity to bargain is contrary to the evidence and without a basis for support. The record is clear that both Unions were informed in the October 25th negotiating session that all benefits, including holiday pay, were being discontinued. Moreover, the testimony of the chief negotiator for the Union, reveals that at the negotiating meeting on October 25, he fully understood that Sherwin-Williams was going to cease payment of all benefits provided by the expired contract.

Even though the Company notified the Union of the cessation of all benefits provided by the expired contract, the Board contends that it did not have an opportunity to bargain as to the withholding of holiday pay; the Board argues that at the October 25 negotiation session, the Company announced the termination of holiday pay as an accomplished fact. We find this argument unavailing and disagree with the Board's assertion that the Company's announcement of termination of benefits was so absolute as to preclude any possibility of bargaining on the issue of holiday pay. The Company's "duty was merely to present the Union with a meaningful chance to offer

the Board in this instance.

input into the decisional process." *NLRB v. J.P. Stevens & Co., Inc.,* 538 F.2d 1152, 1162 (5th Cir.1976). The Company fulfilled its duty by notifying the Union that it was discontinuing all benefits provided by the expired contract. After being notified, it was up to the Union to raise its concerns about the termination of benefits, including holiday pay. The Union not only had the opportunity to bargain on the issues of holiday benefits during the October 25 negotiating meeting, but it also had the opportunity to bargain during the numerous negotiating sessions that took place between October 25, 1979 and January 4, 1980. For whatever reason, the Union chose not to voice its concern about the termination of holiday benefits, even though the Company gave notice of such termination at the first negotiating session following the commencement of the strike. The Union cannot be heard to complain at this time. We conclude that Sherwin-Williams ceased paying holiday benefits to employee Odum after notifying the Union of such withdrawal, and that the Union had ample opportunity over a period of two and one-half months to bargain with the Company regarding such withdrawal. Thus, the evidence of record does not support the findings and Order of the Board regarding holiday benefits.

Enforcement DENIED.