The **UNITED STEEL WORKERS OF AMERICA, AFL–CIO–CLC, and United Steelworkers of America, Local Union No. 7044, Plaintiffs,**

v.

Judith **MEIERHENRY, In her capacity as Secretary of the South Dakota Department of Labor, Defendant.**

**Civ. No. 83–3085.**

United States District Court, D. South Dakota, C.D.

March 15, 1985.

* *See Rule* 19(a) of the Federal Rules of Civil Procedure.

John G. Engberg, Peterson, Engberg & Peterson, Minneapolis, Minn., Dennis W. Finch, Finch & Viken, Rapid City, S.D., for plaintiffs.

Ronald W. Banks, Banks & Johnson, Rapid City, S.D., for defendant.

## MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

### FACTUAL BACKGROUND

Plaintiff (union) is the representative of the production and maintenance employees of the Homestake Mining Company (Homestake) in Lead, South Dakota.[1] On May 31, 1982, Homestake had 1,345 employees involved in production and maintenance. Of these, 1,141 belonged to the Union, while 204 did not.

A contract between Homestake and the union expired on May 31, 1982, and, upon a majority vote of its members, the union commenced a strike against Homestake on June 1, 1982. At least some of the employees, both union and non-union, attempted to go to work that day, but all were turned back by Homestake. Homestake essentially shut down its operations until the signing of a new contract on September 26, 1982.

During the strike, many of the idled employees applied to the South Dakota Department of Labor for unemployment compensation benefits. Initially, all applicants, whether union or non-union, were denied benefits. In August, 1982, the Department of Labor reversed its decision, and granted benefits to the non-union applicants. This was based on an interpretation of SDCL 61–6–19, which prohibits the payment of unemployment benefits to claimants unemployed because of a labor dispute unless the claimant is not participating in, financing, or directly interested in the dispute and does not belong to the class of workers involved in the dispute, *or* unless the claimant is locked out by the employer. The decision granting benefits to Homestake's non-union employees states:

> The claimants do not belong to the union that is involved in the labor dispute. In addition, the claimants are not participating in or financing the labor dispute, but

---

1. Jurisdiction for this action is based on 28 U.S.C. § 1343 and 42 U.S.C. § 1983, involving the question of whether defendant, acting under color of state law, deprived plaintiff of rights under 29 U.S.C. § 157.

would be directly interested in the labor dispute in that any changes in wages, hours or working conditions, which resulted from the labor dispute, will apply to the claimants ... However, the claimants have been available for work since the labor dispute commenced, but the employer has declined to allow them to commence work. In view of this circumstance, the claimants would, in effect, be locked out from their employment by the employer. Since the claimants are locked out from their employment by the employer, they would be eligible for the receipt of unemployment insurance benefits.

On the other hand, union employees continued to be held ineligible for benefits. The State Department of Labor decision observed that most union applicants were engaged in picketing, that they had financed the strike in their payment of union dues from which strike benefits were paid, and that they were directly interested in the outcome of the strike. It made no difference that some seemed to oppose the strike; the decision found

> Some claimants might be willing to cross a picket line to resume work for the employer and feel that since the mine is shut down they are locked out from employment from the employer. However, the claimants do belong to Local 7044 of the United Steelworkers of American union whose membership did vote to go on strike against the employer. As members of the union which went on strike against the employer, the claimants would have initiated the labor dispute prior to any employment being withheld by the employer. Consequently, it cannot be said that the claimants are locked out by the employer. In view of all the above factors, the Referee must hold that the claimants are ineligible for the receipt of unemployment insurance benefits.

Defendant, in her capacity as the Secretary of the state Department of Labor, affirmed these decisions. In her deposition, defendant stated that "we were not necessarily making a determination on eligibility based on union membership. The thing that made the determination is whether they were out of work through no fault of their own."

Following this decision, non-union employees received unemployment benefits in the approximate amount of $129 per week. Union employees received, during the course of the strike, union strike benefits which began at $40 per week, gradually rising to $67 per week by the last week of the strike. For several weeks, the union operated a cooperative food store for union members, and also established a strike kitchen that served lunches to union members and their families during the strike.

At least several members of the union attempted to resign their union membership during the strike to establish eligibility for unemployment benefits. These attempts were not successful, as union rules allowed resignations only during the month of November, and in any event, the state would apparently not have paid any unemployment benefits to claimants who had been union members at the commencement of the strike. After the strike had ended, however, approximately 124 individuals did resign from the union. While it is plain that dissatisfaction with union leadership was a factor in many of these resignations, it is also clear that the availability of unemployment benefits was a factor in at least some of these resignations. Plaintiff was able to produce the testimony of seven employees who either resigned or attempted to resign from the union who identified the unemployment benefits issue as the principal or a leading factor in their decisions to resign. The record also indicates that an undetermined number of other union members resigned because of the unemployment compensation issue.

### DISCUSSION

#### I.

■ Initially, defendant claims this case must be controlled by the court's decision in *United Steelworkers of America v. Block,* 578 F.Supp. 1417 (D.S.D.1982).

*United Steelworkers* certainly considered many of the same issues as the present case, involving, as it did, the same "locked out" distinction between the Homestake's union and non-union employees in their eligibility for food stamps during the same 1982 strike. The principle point on which the *United Steelworkers* case turned, however, was the finding that plaintiff had no standing to bring the action. While *United Steelworkers* recognized that "an organization, such as a union, has standing to assert the ... rights of its members," 578 F.Supp. at 1419, the court found that "the union failed to establish that it lost a single member, present or prospective, on account of [the grant of food stamps to non-union employees.]" 578 F.Supp. at 1421. Here, the union has, as indicated by the factual summary, established the loss of at least several members because of defendant's unemployment benefits policy, and a resultant reduction in dues paid to it by those lost members. Assuming the correctness of the standing decision in *United Steelworkers*, the court is satisfied that plaintiff here has shown an injury to it as a result of defendant's policy and may assert the claims in the complaint.[2]

## II.

Mindful of its obligation to avoid, wherever possible, deciding cases on constitutional grounds when other grounds for decision exist, the court turns first to plaintiff's argument that defendant's interpretation of South Dakota unemployment compensation guidelines is preempted by 29 U.S.C. § 157, generally referenced as Section 7 of the National Labor Relations Act (NLRA):

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.

A violation of these rights constitutes an unfair labor practice under 29 U.S.C. § 158(a)(1) (Section 8(a)(1) of the NLRA).

Cases dealing with NLRA preemption are innumerable, and frequently confusing. One of the Supreme Court's most recent decisions in the area, *Brown v. Hotel and Restaurant Employees,* —— U.S. ——, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984), makes this much clear:

> If the state law regulates conduct that is actually protected by federal law, however, pre-emption follows ... as a matter of substantive right. Where, as here, the issue is one of an asserted substantive conflict with a federal enactment, then "[t]he relative importance to the state of its own law is not material ... for the Framers of our Constitution provided that the federal law must prevail."

—— U.S. at ——, 104 S.Ct. at 3187, 82 L.Ed.2d at 384. As the court in the leading case of *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959), states, "[w]hen it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 8 [29 U.S.C. § 158], due regard for the federal enactment requires that state jurisdiction must yield." The question plaintiff puts to the court, therefore, is whether the South Dakota unemployment compensation law conflicts with the rights contained in 29 U.S.C. § 157.

Curiously, the precise issue presented here does not appear to have previously arisen. The case that comes closest, and upon which defendant relies most heavily, is *New York Telephone Co. v. New York State Department of Labor,* 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553

---

**2.** *United Steelworkers* also, of course, proceeded to reject plaintiff's substantive claims, devoting most of the opinion to a discussion of the asserted violations of union members' rights to freedom of association and equal protection. This court does not reach the similar claims raised here for the reason given *infra. United Steelworkers* also rejected plaintiff's claims under 29 U.S.C. § 157, but did so without extensive analysis and without citation of authority. This court is accordingly free to consider the § 157 contentions here.

(1979). Initially, it might be noted that a majority of the court in *New York Telephone Co.* was unable to agree upon an opinion, and joined only in the judgment that the NLRA did not preempt a state from paying unemployment compensation to strikers. To the extent that this meant that all persons idled by a strike, whether union or non-union members, were eligible under New York law for unemployment benefits, it certainly can be argued that the New York unemployment policy had no real impact on the rights protected by the 29 U.S.C. § 157, and, in fact, no claim of any violation of § 157 was advanced in the case. 440 U.S. at 529, 99 S.Ct. at 1335. As the plurality opinion recognized, the New York policy implemented "a broad state policy that does not primarily concern labor-management relations, but is implicated whenever members of the labor force become unemployed." 440 U.S. at 534, 99 S.Ct. at 1337. Although, as the plurality opinion noted, the general applicability of a state law is not sufficient to exempt the law from NLRA preemption, *see Farmer v. Carpenters*, 430 U.S. 290, 300, 97 S.Ct. 1056, 1063, 51 L.Ed.2d 338 (1977), the South Dakota law at issue here, in its specialized application to union versus non-union workers unemployed by a strike, can hardly be considered to be of general applicability. It might also be noted that the plurality opinion in *New York Telephone Co.* emphasized its view that the New York statute must be treated with "the same deference ... afforded analogous state laws of general applicability that protect interests 'deeply rooted in local feeling and responsibility.'" 440 U.S. at 540, 99 S.Ct. at 1341. Given the later language in *Brown, supra,* —— U.S. at ——, 104 S.Ct. at 3187, 82 L.Ed.2d at 384, that the importance of state law is of no materiality when there is an asserted substantive conflict with federal law, the continued vitality of at least portions of the plurality opinion seems questionable. Finally, this court does not find that the legislative history cited in *New York Telephone Co. supra,* 440 U.S. at 540–545, 99 S.Ct. at 1341–1344, that indicated a Congressional intent to leave to the states the decision of whether to pay unemployment benefits to strikers is relevant here. While a neutral unemployment benefit policy which does not conflict with any specific provision of the NLRA, *see New York Telephone Co.,* 440 U.S. at 529–530, 99 S.Ct. at 1335–1336, may not be preempted, it can hardly be argued that Congress intended to allow states power to administer their unemployment programs in such a manner as to directly interfere with express rights guaranteed under either 29 U.S.C. § 157 or 29 U.S.C. § 158. For these reasons, the court does not consider its decision here controlled by *New York Telephone Co.*[3]

### III.

■ Turning to the question of whether the South Dakota unemployment compensation policy at SDCL 61–6–19, violates 29 U.S.C. § 157, the court is mindful of the proposition, which defendant does not dispute, that "coercive actions which the [NLRA] forbids employers and unions to take ... are likewise prohibited from being taken by the States." *Nash v. Florida Industrial Com.,* 389 U.S. 235, 239, 88 S.Ct. 362, 366, 19 L.Ed.2d 438 (1967). Under 29 U.S.C. § 158(a)(1), which makes violations of § 157 an unfair labor practice, it is clear that "not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken

**3.** The plurality in *New York Telephone Co.* also suggested some sort of policy on the part of lower courts to avoid implying pre-emption in the area of welfare programs. 440 U.S. at 534 n. 23, 99 S.Ct. at 1337 n. 23. Yet, the main case cited for this proposition, *Super Tire Engineering Co. v. McCorkle,* 550 F.2d 903 (3rd Cir.1977), announced no such policy, but based its decision on its interpretation of the meaning of *Kimbell, Inc. v. Employment Security Commis-* sion, 429 U.S. 804, 97 S.Ct. 36, 50 L.Ed.2d 64 (1976). *Kimbell* summarily dismissed, for want of a substantial federal question, an appeal of a case dealing with welfare payments to strikers. The case most severely criticizing the analysis of *Super Tire* is *New York Telephone Co. v. New York State Department of Labor,* 566 F.2d 388 (2d Cir.1977) which, paradoxically, is the very case affirmed by the Supreme Court in *New York Telephone Co.*

with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect" is a violation of § 157. *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964). Or, as this circuit has put it, " '[i]nterference is no less interference because it is accomplished through allurements rather than coercion.' " *NLRB v. Crown Can Co.*, 138 F.2d 263, 267 (8th Cir.1943). *See also NLRB v. Gilmore Industries, Inc.*, 341 F.2d 240 (6th Cir.1965); *NLRB v. Douglas and Lomason Co.*, 333 F.2d 510 (8th Cir.1964). Plaintiff concedes that it cannot show that the South Dakota policy was undertaken with the specific intent to impinge on employees' freedom of choice for unionization. This does not, however, end the court's inquiry.

■ Under *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967), "if it can reasonably be concluded that the ... conduct was 'inherently destructive' of important employee rights, no proof of an anti-union motivation is needed." Inherently destructive is, as observed by the case of *Inter-Collegiate Press, Graphic Arts Div. v. NLRB*, 486 F.2d 837, 845 (8th Cir.1973), a term "not easily susceptible of precise definition ... We should not attempt to complete a catalog of actions that might be regarded as 'inherently destructive,' but rather must determine whether the conduct in [any particular] case should be so viewed. One commentator suggests that 'inherently destructive' conduct is that which creates visible and continuing obstacles to the future exercise of employee rights." Put another way, "cases finding ... conduct inherently destructive ... are cases involving conduct with far reaching effects which would hinder future bargaining, or conduct which discriminates solely upon the basis of participation in strikes or union activity." *Portland Willamette Co. v. NLRB*, 534 F.2d 1331, 1334 (9th Cir. 1976). *See also NLRB v. Sherwin-Williams Co.*, 714 F.2d 1095 (11th Cir.1983); *Vesuvius Crucible Co. v. NLRB*, 668 F.2d 162 (3rd Cir.1981).

The case involving inherently destructive conduct coming closest to the factual situation here is *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). In *Erie Resistor*, the employer response to a strike was to announce that strike replacements and strikers leaving the strike would receive a 20-year super-seniority as credit against any future lay-offs by the employer. Within three weeks, a large number of strikers returned to their jobs, and the union was forced to capitulate. Following the strike, many union members resigned their memberships. The *Erie Resistor* court essentially adopted the NLRB's assessment of the impact of the super-seniority, and found (a) the plan affected all strikers; (b) the plan necessarily operated to the detriment of strikers as opposed to nonstrikers; (c) the plan offered individual benefits to strikers as an inducement to abandon the strike; (d) the plan undermined the strikers' mutual interest and dealt a crippling blow to the strike effort; (e) the plan created a permanent reminder of the negative consequences of a strike, rendering future bargaining difficult. Given this analysis, the court held that "super-seniority by its very terms operates to discriminate between strikers and nonstrikers, both during and after a strike, and its destructive impact upon the strike and union activity cannot be doubted." 373 U.S. at 232, 83 S.Ct. at 1147.

While the impact of the South Dakota unemployment compensation scheme is more subtle than the *Erie Resistor* "super-seniority," the state statute has a very similar effect. The discrimination between union and non-union members cannot be denied, and all union members, to the extent they did not find other work, had to survive the strike with substantially less income than did their non-union counterparts. Also undeniable is the fact that the South Dakota statute stands as a permanent, tangible inducement for employees to either abandon their union or to decline to join in the first place. The union must act as representative for all members of the class of worker the union represents,

whether union or not, *see* 29 U.S.C. § 159(a), and as defendant recognizes, all non-union members receive the same benefits as union members under any contract negotiated. The most potent and well-known union weapon in contract negotiations is a strike, but this, of course, necessarily brings severe monetary hardship on those left unemployed by a strike. What the state unemployment statute says, in effect, is that if an employee stays out of the union, he can be sure that he will receive an income if there is a strike, and will also receive the benefit of any changes brought about by the strike. This lesson was not lost on plaintiff's members during the 1982 strike. As one individual who resigned his membership testified:

> Well, I couldn't understand why we should pay the Union dues all the time that we're belonging to the Union and they're nonunion and they're not paying any dues, they're getting the same benefits we are plus the only thing they didn't get from the Union was the forty dollars a week. They got one hundred twenty or one hundred thirty from the State of South Dakota, and I didn't think that was very fair because they're going to benefit from the strike just as much as a Union member is.

Unlike *Erie Resistor*, the state statute does not offer an inducement to abandon a particular strike, since unemployment compensation will not be paid to anyone who was a union member at the commencement of the strike. Viewed from another perspective, however, the state statute is even more insidious than the *Erie Resistor* "super-seniority," in that the inducement is not just to abandon *one* strike, but to abandon the union itself and *all* future strikes. An offer of income in the event of strikes in return for refraining from union membership seems no less an inducement to reject union membership than an offer to raise wages or to build an employee swimming pool if a union is defeated in its organizing election. *See NLRB v. Douglas and Lomason Co., supra.*[4]

Further, the parties stipulated that two or more union members tried to resign during the strike so they could get unemployment benefits. No resignation was effective unless made in November; if the strike had continued until that month, it is reasonable to infer that a number of members would have tendered effective resignation to attempt to receive unemployment benefits. Whether they would have in fact received the benefits is less important than the fact their resignations would have inevitably weakened the strike effort.

Finally, the state statute tended to create a cleavage in the work force between those who remained committed to the union after the strike and those who, because of financial pressures, found unemployment benefits during a strike more attractive than union membership. The administration of the statute left a permanent reminder to Homestake's employees of the ramifications of union membership as opposed to non-union membership during a strike. As another resignee testified:

> Q. Now, what were the reasons for resigning from the Local in November of 1982?
>
> A. Well, the unemployment, I really didn't like the unemployment deal where the nonunion members got unemployment and I'm sitting here on forty dollars a week and they're getting the full benefits that you get out of a strike. Well, this didn't seem right, that they should get unemployment and us not because we were shut out, too.
>
> Q. But by this time the strike is over, right, November 1982?
>
> A. Yeah.

---

**4.** It might be observed that the cases dealing with inducement as an unfair labor practice require a showing of an intent to interfere since a wage increase could be "part of a general wage plan and one which was granted independently of union activity." *Douglas and Lomason Co.,* 333 F.2d at 514. Here, it can hardly be argued that the statutory grant of benefits is unrelated to union activity, since all union members are denied benefits while all non-union employees are made eligible.

Q. Well, was it a financial reason or was it just shall we say a quarrel with the way the system was working that caused you to resign?

A. *No, I just thought there might be another one, and if there is another strike, I want to be on the paying end of it.*

Q. *There might be another strike you say?*

A. *Might be.*

Q. Any other reasons for your resignation from the Union?

A. Well, I didn't like the way it was held, the meetings that was held, some of them, but that was—the main reason was that I am drawing forty dollars a week and everybody else is running around town getting one hundred and some.

(Emphasis supplied.)

Defendant complains that plaintiff was able to produce no more than the seven who testified their resignation was in whole or in part caused by the state statute, and the names of two others who apparently resigned for the same reasons. Yet the court must be cognizant that the relations between a union and its former members cannot be considered to be particularly favorable, and from the fact plaintiff was able to obtain the testimony of these seven, it is reasonable to infer that a substantial number of the rest of the 124 resignations in November, 1982 were due, in whole or in part, to defendant's policy. Even more significantly, in the court's view, these resignations came more than a month *after* defendant's policy had ceased to have any direct impact on anyone working at Homestake. In other words, those who resigned from the union were now back at work, and ineligible for unemployment benefits in any event. Under the terms of the new contract between the union and Homestake, there could not be another strike until 1986. The fact some members still resigned because of the unemployment benefits issue is a strong indication that, as the time for contract negotiations nears again, and the chance of a new strike reappears, many more union members will take defendant's policy into account in their decision of whether to remain in the union. The 1982 resignations allow this court a reasonable inference that many union members will choose to resign, simply so that if there is a strike, they will be able to receive benefits. This will have the direct effect of weakening plaintiff as it enters into bargaining and making that bargaining much more difficult.

■ Based on the foregoing analysis, the court has no hesitation in finding that the "allurements" or "inducements" offered by defendant in the state unemployment compensation law create a visible and continuing obstacle to the future exercise of the employee right, guaranteed under 29 U.S.C. § 157, to decide whether to belong to a union, *Inter-Collegiate Press, supra,* 486 F.1d at 845,[5] and have far reaching effects that would hinder future union bargaining and discriminate solely upon the basis of participation in strikes or union activity,[6] *Portland Willamette Co., supra* 534 F.2d at 1334. Thus, the South Dakota statute is "inherently destructive" of, and in direct conflict with, the right to unionize under 29 U.S.C. § 157; to allow the state unemployment compensation policy to stand would frustrate the purposes of the NLRA. Accordingly, the court must hold

5. The record in the case distinguishes it from *Inter-Collegiate Press,* where there had been no showing that the union's position had been jeopardized or that it had suffered any diminution in its capacity to represent the employees; no union member resigned his membership.

6. Defendant testified in her deposition that union membership was not considered, only whether an individual was out of work through no fault of his own. However, *no* union member was allowed benefits, whether he had voted against the strike, *see* Lawrence Heinbaugh deposition at 7, or whether he would have been willing to cross the picket line to return to work, while *all* non-union members were granted benefits, so long as they met all other relevant statutory criteria, such as sufficient base period earnings.

that the South Dakota statute is preempted by 29 U.S.C. § 157.[7]

## IV.

Since the court has found for plaintiff on this ground, in accordance with the basic principle that courts should avoid, wherever possible, constitutional questions, the court will not consider plaintiff's claims under the First and Fourteenth Amendments to the United States Constitution. The court therefore turns to the question of the remedy. Plaintiff asks either that defendant be ordered to pay benefits to the union member who applied for unemployment compensation in 1982, or that defendant be ordered to recover the unemployment benefits paid to nonunion members in 1982. The court finds no basis for either order. As to the first alternative, the court must read *New York Telephone Co., supra,* as holding that the states have the power to decide whether or not to pay unemployment benefits to strikers, so long as that payment does not otherwise interfere with the NLRA. South Dakota's unemployment policy, or at least the portions left intact by this ruling, clearly demonstrates a choice to *not* pay strikers. The court does not find it has the power to order a different decision, even as a remedial measure. The second alternative, that of recovering the benefits paid out, the court considers highly inequitable. After the lapse of more than two years, it would be grossly unfair to force the repayment of money received by innocent parties to redress the wrongfulness of defendant's actions.

 The court concludes that the injury to plaintiff is fully remedied by a permanent injunction enjoining defendant from ever construing SDCL 61–6–19 in such a way as to allow the payment of unemployment compensation benefits to non-union employees idled by a strike while the same grade or class of employees who are members of a union are denied unemployment benefits based upon their membership in a union.

This opinion shall constitute this court's findings of fact and conclusions of law.

Judgment will be entered accordingly.

7. While *Brown v. Hotel and Restaurant Employees, supra,* makes it clear that when a state law conflicts with 29 U.S.C. 157, the importance of the state law is immaterial, the court in any event finds no validity in defendant's argument that the grant of unemployment benefits to non-union employees was necessary since they were not receiving the union strike benefits. The state statute does not mention the presence or absence of "strike benefits" as a factor to be considered in granting unemployment benefits, and in fact the decision of the Department of Labor granting benefits, quoted at length *supra,* made no reference to the fact the non-union Homestake employees were not receiving strike benefits. It seems clear that even in a situation where a union did not, for some reason, have a strike fund, or the strike fund had become depleted, so that no strike benefits were being paid to union members, non-union members would still qualify for unemployment benefits. Further, it should also be noted that Homestake employees who did not join the union were exempt from a monthly deduction, approximately $21 in 1982, from their paycheck for union dues, a savings that at least partially mitigates their ineligibility for union benefits in the event of a strike.