The **UNITED STEELWORKERS OF AMERICA AFL–CIO–CLC, and United Steelworkers of America, Local Union No. 7044, Appellees,**

v.

**Julie M. JOHNSON, in her capacity as Secretary of the South Dakota Department of Labor, Appellant.**

No. 85–5101.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 12, 1985.

Decided Aug. 22, 1986.

Rehearing Granted Oct. 28, 1986.*

Wayne F. Gilbert, Rapid City, S.D., for appellant.

John G. Engberg, Minneapolis, Minn., for appellees.

Before LAY, Chief Judge, FAGG, Circuit Judge, and ROSENBAUM*, District Judge.

* See 8th Cir., 804 F.2d 440.

* The HONORABLE JAMES M. ROSENBAUM, United States District Judge for the District of Minnesota, sitting by designation.

ROSENBAUM, District Judge.

In this case we are called upon to consider the application of certain portions of the State of South Dakota's unemployment compensation scheme, specifically the provisions of S.D. Codified Laws, Section 61–6–19.[1] By this statute South Dakota denies unemployment compensation benefits to individuals when their unemployment is the result of a labor dispute. The statute then restores these benefits to the out-of-work employee if it is shown to the satisfaction of the South Dakota Department of Labor that the unemployment results from a lockout by the employer. The United States District Court,[2] upon consideration of this statute, found Section 61–6–19 to be pre-empted by Section 7 of the National Labor Relations Act ("NLRA"), 29 U.S.C. 157.[3] We affirm.

*Facts*

This is the second of two cases, dealing with issues of benefit allocation to unemployed workers, arising out of a labor dispute at the Homestake Mining Company of Lead, South Dakota ("Homestake" or "Mine").[4] On June 1, 1982, by vote of a majority of its members, plaintiff United Steelworkers of America ("Steelworkers" or "Union") struck the Homestake Mine. Some of the employees, both union and non-union, attempted to go to work on that day. All those attempting to work were refused entry by Homestake. Management, thus, declared a lockout. The mine remained closed under this union-strike/management-lockout formulation until September 26, 1982, when a new employment contract was accepted.

From June 1 to September 26, 1982, during the period of shutdown, many of Homestake's miners sought unemployment benefits. These benefits were principally of two types: Federal Food Stamp assistance and State unemployment compensation. Each type of benefit gave rise to one of the two lawsuits which grew out of this employment dispute.

1. The food stamp decision

Acting under the guidance of the United States Department of Agriculture's interpretation of 7 U.S.C. 2015(d)(4) and 7 C.F.R. 273.1(b)(1), the South Dakota Department of Social Services provided food stamps to non-union members, determining them to be locked out and therefore eligible. Conversely, union members were denied food stamp benefits.

The plaintiff Union challenged the Department of Social Services' allocation of food stamps to the non-union members and the denial of those stamps to the strikers. This was asserted in an action heard prior to the present case. The District Court, Bogue, J., concluded that the Union lacked standing to assert its claims. It made this finding on the basis of the Union's failure to establish that it, as a party, had suffered

---

**1.** An individual shall not be entitled to any benefits for any week with respect to which the director finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed, provided that this section shall not apply if it is shown to the satisfaction of the department that:
   (1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and
   (2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; and
   (3) He is locked out by his employer.

If in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purpose of this section, be deemed to be a separate factory, establishment or other premises. S.D. Codified Laws, Section 61–6–19.

**2.** The HONORABLE DONALD J. PORTER, United States District Judge for the District of South Dakota.

**3.** *Steelworkers v. Johnson, sub nom., United Steelworkers of America v. Meierhenry*, 608 F.Supp. 201, 209 (1985).

**4.** The first case, *United Steelworkers of America v. Block*, 578 F.Supp. 1417 (D.S.D.1982), is discussed below.

an injury in fact. The District Court held that:

> [T]he Union failed to establish that it lost a single member, present or prospective, on account of defendants' application of section 2015(d)(4) to the strike at the Mine. * * * Accordingly, the Court finds and concludes that the Union has no standing....

*United Steelworkers of America v. Block,* 578 F.Supp. 1417, 1421 (D.S.D.1982). The District Court in *Block,* having disposed of the case, then discussed its views of the Union's constitutional and preemption claims. *Id.* at 1421–24. Because the case was decided upon the Union's lack of standing, those views remain dicta and cannot be the law of that case, or this.

### 2. The unemployment compensation case

Upon the initiation of the labor dispute, all of Homestake's employees were denied unemployment compensation, regardless of their union membership. This position changed in August, 1982. At that time, acting under the rubric of Section 61–6–19, the South Dakota Department of Labor awarded unemployment compensation benefits to non-union members. The Department of Labor reached this conclusion by applying Section 61–6–19 to the circumstances of the Homestake strike. On this analysis, the Department director found the non-union members to be locked out and eligible for unemployment compensation. The Department held that the union members, on the other hand, were out of work due to their participation in a labor dispute; they were therefore ineligible under the provisions of Section 61–6–19(3).

The distinction between union and non-union employees meant non-union members were entitled to unemployment benefits of approximately $129 per week. In contrast, union members received no food stamps, but did get union-contributed strike benefits which began at $40 per week and eventually rose to $67 per week.

Steelworkers' challenge to the Department of Labor's allocation of unemployment compensation was properly before the lower court. Unlike the factually-related food stamp case, the Union, here, is able to point to tangible injury in the form of attempts at resignation by its union members in order to establish eligibility for unemployment compensation.[5] The members were unable to resign immediately because the Union's by-laws required membership until the month of November in each year. The Union also produced evidence of additional resignations after the conclusion of the strike, motivated by a fear of lost unemployment benefits in the event the membership would strike in the future. Based on this demonstrated con-

---

**5.** The parties stipulated that South Dakota's policy with respect to unemployment compensation was a factor in some of these resignations. In addition, testimony of several employees leaves no doubt as to their motivation:

Q: Now, what were the reasons for resigning from the Local in November of 1982?
A: Well, the unemployment, I really didn't like the unemployment deal where the non-union members got unemployment and I'm sitting here on forty dollars a week and they're getting the full benefits that you get out of a strike. Well, this didn't seem right, that they should get unemployment and us not because we were shut out, too.
Q: But by this time the strike if over, right, November 1982?
A: Yeah.
Q: Well, was it a financial reason or was it just shall we say a quarrel with the way the system was working that caused you to resign?

A: No, I just thought there might be another one, and if there is another strike, I want to be on the paying end of it.

Or, in the words of another resignee:
Q: And was your gripe, apart from the terms of the contract, that unemployment compensation from the State was more than the forty dollar strike benefit?
A: Oh, yeah.
Q: That was your gripe?
A: Well, I couldn't understand why we should pay the Union dues all the time that we're belonging to the Union and they're non-union and they're not paying any dues, they're getting the same benefits we are plus the only thing they didn't get from the Union was the forty dollars a week. They got one hundred twenty or one hundred thirty from the State of South Dakota, and I didn't think that was very fair because they're going to benefit from the strike just as much as a Union member is.

nection between the allocation of unemployment benefits and attempted and actual resignations, the trial court made a factual determination that the plaintiffs had standing to raise their claims.

The District Court proceeded to hold that the pattern of benefit allocation followed by the Department of Labor:

create[s] a visible and continuing obstacle to the future exercise of the employee right, guaranteed under 29 U.S.C. [section] 157, to decide whether to belong to a union.... Thus, the South Dakota statute is "inherently destructive" of, and in direct conflict with, the right to unionize under 29 U.S.C. [section] 157.... Accordingly, the court [held] that the South Dakota statute is preempted by 29 U.S.C. [section] 157.

*Steelworkers v. Meierhenry*, 608 F.Supp. at 208–09. As a consequence, the District Court enjoined the defendant Secretary of Labor from construing Section 61–6–19 so as to allow the payment of unemployment benefits to non-union employees and to deny those same benefits to union employees when each group of workers was idled by the same strike. *Id.* at 209.

*Analysis*

This Court affirms the decision of the District Court based upon alternate reasoning. The trial court focused its preemption analysis on a series of cases which dealt with management acts found to be contrary to rights protected by the NLRA. The decisions in *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), and *Inter-Collegiate Press v. NLRB*, 486 F.2d 837 (8th Cir.1973), were cited. These decisions analyzed employer conduct by assessing whether these management acts were "inherently destructive" of protected employee rights. *Great Dane*, 388 U.S. at 34, 87 S.Ct. at 1798; *Inter-Collegiate*, 486 F.2d at 844–45.

The District Court proceeded from this employer-focused precedent to this present case involving State action by analyzing the United States Supreme Court's decision in *Nash v. Florida Industrial Comm.*, 389 U.S. 235, 88 S.Ct. 362, 19 L.Ed.2d 438 (1967). The Supreme Court in *Nash* considered the Florida State Industrial Commission's denial of unemployment compensation benefits to an individual solely because she filed an unfair labor practice charge with the NLRB. In finding the Commission's activities to be preempted because they frustrated the NLRA's enforcement, the Supreme Court stated that:

We have no doubt that coercive actions which the [National Labor Relations] Act forbids employers and unions to take against persons making charges are likewise prohibited from being taken by the States.

*Nash*, 389 U.S. at 239, 88 S.Ct. at 366.

The District Court combined these decisions to reach the conclusion that, under *Nash*, States are prohibited from doing anything inherently destructive of employee rights. *Steelworkers v. Meierhenry*, 608 F.Supp. 201, 208–09. Finding the South Dakota unemployment statute, Section 61–6–19, to be inherently destructive of the right to unionize, the District Court held it to be preempted by Section 7. *Id.*

This Court declines to adopt the District Court's analysis. First, factual differences make the relevance of the *Nash* holding questionable. The Court in *Nash* considered actions taken by a State administrative agency against a single individual. This case, in contrast, involves a State's legislatively-enacted distinction between union and non-union employees in the distribution of public support benefits. More importantly, we find the well established body of orthodox preemption analysis to be sufficient for the present task. The multistep analysis relied upon by the District Court, however valid, is simply unnecessary here.

1. Preemption analysis

The preclusive effect of Congress' enactments was established in 1819, when Chief Justice Marshall declared that "the States have no power ... to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by

Congress to carry into execution the powers vested in the general government." *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 436, 4 L.Ed.2d 579 (1819). The Supreme Court struck down a State law which "frustrates the purpose of the national legislation...." *Davis v. Elmira Savings Bank,* 161 U.S. 275, 283, 16 S.Ct. 502, 503, 40 L.Ed. 700 (1896). The line of preemption cases was extended into the twentieth century and the field of NLRA labor law in 1945 when the Supreme Court, in *Hill v. Florida,* 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed. 1782 (1945), held a State labor regulation to be precluded because it constituted "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." 325 U.S. at 542, 65 S.Ct. at 1375 (citations omitted).

As recently as 1984, the Supreme Court focused its NLRA preemption analysis on whether the State enactment comes into actual conflict with the intent of the Congress. *Brown v. Hotel and Restaurant Employees and Bartenders,* 468 U.S. 491, 502, 104 S.Ct. 3179, 3186, 82 L.Ed.2d 373 (1984). *Brown* presented the Supreme Court with a challenge to a New Jersey statute restricting certain persons from filling union officer positions. Specifically, the statute provided that unions representing casino employees can be prohibited from receiving dues if union officers fail to satisfy prescribed criteria regarding certain criminal convictions. N.J.Rev.Stat. 5:12–93(b). The plaintiff unions asserted the statute denied the freedoms guaranteed under Section 7 of the NLRA by impermissibly restricting the selection of collective bargaining representatives. In upholding the New Jersey law, the Court built its Section 7 preemption analysis on the foundation principle that

> [e]ven in the absence of ... express language or implied congressional intent to occupy the field, we may nevertheless find state law to be displaced to the extent that it actually conflicts with federal law. Such actual conflict between state and federal law exists when ... state law "stands as an obstacle to the accomplishment and execution of the full

purposes and objectives of Congress," *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404 [85 L.Ed. 581] (1941).

*Brown,* 468 U.S. at 501, 104 S.Ct. at 3186.

The analytic framework of *Brown* and its predecessors focuses on the existence of policy conflict between explicit federally regulated activities and state intrusions upon them. This has not been the only analysis used to determine congressional preemption of state regulation. A parallel body of preemption doctrine strikes down state entry into areas which Congress intended to leave unregulated. This second line of preemption precedent was most recently articulated in *Golden State Transit Corp. v. City of Los Angeles,* —— U.S. ——, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986). This analysis traces its lineage to the 1976 decision in *Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). *Golden State* considered the City of Los Angeles' attempts to impose preconditions on the renewal of a taxicab franchise. The Supreme Court concluded that the City by its actions imposed restrictions on the collective bargaining process, an area in which Congress' explicit forbearance precludes state regulation. *Golden State,* —— U.S. at ——, 106 S.Ct. at 1398.

In reaching its decision, the Supreme Court explicitly declined to consider the preemption analysis followed in *Brown,* and *San Diego Building Trades v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), saying, "[w]e do not reach the question whether the city's action in this case is pre-empted under *Garmon,* because Golden State and its supporting *amici,* including the NLRB, rely exclusively on the *Machinists* doctrine, and we find their argument persuasive." *Golden State,* —— U.S. at ——, n. 4, 106 S.Ct. at 1398, n. 4.

Another recent decision, *Baker v. General Motors,* —— U.S. ——, 106 S.Ct. 3129, 92 L.Ed.2d 504 (1986), discusses a state unemployment compensation plan vis-a-vis the NLRA. The Court has considered this decision, and finds, by the Supreme Court's

own terms, that *Baker* is inapposite in the present instance. The Court in *Baker* considered aspects of Michigan's statutory unemployment compensation scheme, which as interpreted by the state exempted payments to strikers who funded a strike war chest by collecting extraordinary union dues. The Court found that the statutory scheme was not preempted by Section 7 of the NLRA, because any conflict between Michigan's unemployment compensation scheme and the NLRA was within the contemplation of Congress when it enacted the Social Security Act of 1935, 42 U.S.C. 301, *et seq.*, in the same year as it passed the NLRA.

The present case, of course, presents no such emergency strike fund, and the Supreme Court specifically declined to consider a case in which union employees paid only ordinary union dues. *Baker,* —— U.S. at ——, 106 S.Ct. at 3139. Nor was *Baker* a case such as this, where the work force was divided between union and nonunion employees. Further, unlike Michigan, South Dakota is a "right to work" state. S.D. Codified Laws Sections 60–8–3 through 60–8–6. Homestake is an enterprise at which union and nonunion employees work side by side, performing the same tasks, and at which the compensation of *both* union and nonunion employees is determined by the contract benefits negotiated between the union and management. These analytic and factual differences render *Baker* inapplicable here.

The *Golden State* and *Baker* decisions therefore leave the *Brown/Garmon* doctrine intact; state activities which are in actual conflict with Congressional policies remain preempted. It is, then, to the existence of actual conflict and the question of whether South Dakota law stands as an obstacle to the Congress' express purposes that the Court now turns.

This case highlights the conflict between Section 61–6–19 of the South Dakota Code and Sections 7 and 8 of the NLRA. Actual conflict in this case arises both out of the direct provisions of the South Dakota statute and its effect on the balance of power between labor and management. This Court, then, is squarely faced with the issue of whether the South Dakota statute in question stands as an obstacle to the "full purposes and objectives of Congress" underlying Sections 7 and 8 of the NLRA.

These purposes and objectives of the National Labor Management Relations Act in general, and Sections 7 and 8 in specific, can be divined from several sources. First, Section 1 of the Act, 29 U.S.C. 151, contains a general statement of policy. Second, the terms of Sections 7 and 8, 29 U.S.C. 157 and 158, give particular meaning and emphasis to those policies. Finally, the legislative history of the Labor Management Relations Act, summarized at 1947 U.S. Code Cong.Service 1135, expresses Congressional concern for the specifics of the balance of power between management and labor organizations.

This concern with perceived inequalities of bargaining power, to be remedied on a national level, is expressed in Section 1 of the Act.

> The inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association substantially burdens and affects the flow of commerce, and tends to aggravate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries.

29 U.S.C. 151. Section 1 thus expresses Congress' perception of a negative effect on interstate commerce, arising from an inequality of bargaining power between employees deprived of freedom of association and their employers.

> Section 7 of the Act provides that:
> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concert-

ed activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities....

29 U.S.C. 157. These rights are further strengthened by Section 8(a)(1), which makes unlawful employer interference with these rights. 29 U.S.C. 158(a)(1).

The content of these code sections speaks of a Congressional intent to empower labor organizations with bargaining rights, and thereby to foster the right to concerted labor activity. Congressional interest in a fine and even balance of the dynamic and conflicting interests of labor and management is made still more explicit in the legislative history of the Act. The conference committee which produced the Act recorded the "paramount public interest" in labor disputes. H.R.Rep. No. 510, 80th Cong. 1st Sess. 1 (1947), reprinted in 1947 U.S.Code Cong.Service 1135. The committee then made explicit the "two sided" policy of the Act: it is concerned at once with affording organizational bargaining rights to labor and with minimizing the effects of labor unrest to the benefit of management and the public. *Id.* at 1136.

The conference report details a series of compromises giving substance to these conflicting objectives by carefully structuring the employee-employer balance of power. The committee describes the concern shown by both houses over those concerted activities on the part of labor which will be permitted and those which will be prohibited.[6] The report then chronicles a number of additional provisions in which Congress consciously structures this balance of power.[7]

The importance of these efforts is not limited to their specifics. The resulting congressional enactment and its level of detail bespeak a substantial concern directed toward the balance of labor-management power and a willingness to wade into the mires of labor-management interaction. These evidence a desire by the Congress to influence the details of that interaction on a national level.

The Courts, out of a healthy respect for the Congress' skill in compromising the inevitable conflicts of a functioning society, have endeavored to foster this Congressional policy of even-handed treatment. When dealing with unions, courts demonstrate a willingness to strike down union actions which move beyond the permitted boundaries. *See, e.g., Mobile Mechanical Contractors Assn. v. Carlough,* 664 F.2d 481, 484–85 (5th Cir.1981), *cert. denied,* 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed.2d 850; *Kling v. NLRB,* 503 F.2d 1044, 1046 (9th Cir.1975); *Douds v. Local 1250,* 170 F.2d 700, 701 (2nd Cir.1948). On the same hand, but considering management, courts have found a series of employers' differentiations between union and non-union employees to be inherently destructive of Section 7 bargaining rights, and have uniformly held such differentiations to be unlawful. *See, e.g., NLRB v. Great Dane Trailers,* 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); *NLRB v. Erie Resistor,* 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). Lastly, on behalf of the public, "coercive actions which the [National Labor Relations] Act forbids employers and unions to take against persons making charges are likewise prohibited from being taken by the States." *Nash v. Florida Industrial*

---

**6.** A concern that certain practices of organized labor ought to be prohibited is expressed in the report's discussion of Section 7, *id.* at 1145, and Sections 8(a) and (b), id. at 1148–51.

**7.** The houses agreed to provisions prohibiting attempts of labor organizations to influence employers' selections of collective bargaining representatives. 29 U.S.C. 158(b)(1)(B), discussed in 1947 U.S.Code Cong.Service 1148, 1150–51. The House and Senate agreed to impose upon labor organizations a duty to bargain in Section

8(b)(3), to complement the parallel duty imposed on employers by Section 8(a)(5). 29 U.S.C. 158(a)(5) and 158(b)(1)(B), discussed in 1947 U.S.Code Cong.Service 1149. The committee also acted to correct what it perceived to be an inequality in the rights of free speech resulting from anti-management evidentiary rulings by the NLRB by adding language pursuant to which rights of free speech are guaranteed to employers. 29 U.S.C. 158(c), discussed at 1947 U.S.Code Cong.Service 1151.

*Comm.,* 389 U.S. 235, 239, 88 S.Ct. 362, 366, 19 L.Ed.2d 438 (1967).

This Court finds congressional concern for maintaining the balance of power between employees and employers, reflected in the NLRA, its legislative history, and caselaw, to be directly applicable to this case. We find that Section 61–6–19 alters this balance.

2. The impact of Section 61–6–19

On a very obvious level, the operation of Section 61–6–19 imposes an imbalance in compensation. This imbalance tilts precariously away from union membership. All parties to this dispute acknowledge that contracts negotiated by the union as the collective bargaining representative of the employees are applicable to members and non-members alike. But under South Dakota's law, while benefits are shared equally, compensation in the event of a labor dispute-related shutdown becomes substantially different depending on the employee's union membership status.

Understandably, this distinction was not lost on the union membership. The stipulated facts,[8] which the trial court and we are bound to accept, make this clear. Members attempted to resign from the union during the strike. Further, the record reflects a historically disproportionate number of union members seeking to resign their membership at the first regularly scheduled opportunity following the strike. Thus, we find that the Department of Labor's interpretation of Section 61–6–19 made union members seek to terminate Union membership.

In addition to the disincentives described above, Section 61–6–19 penalizes strike activity itself. The certainty of uneven compensation arising out of a strike/lockout was recognized by union members. This knowledge cannot fail to be a factor in future actual strike votes. The resulting interference in the decision of whether or not to strike transgresses against the congressionally protected right to strike, reflected in 29 U.S.C. 163 and *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 233–35, 83 S.Ct. 1139, 1148–49, 10 L.Ed.2d 308 (1963). Section 61–6–19, as interpreted, therefore stands as another impermissible manipulation of the employee-employer balance of power.

Finally, in a subtle but pernicious sense, the differentiation between union and non-union members works to impermissibly strengthen the hand of management in labor disputes. In the absence of the South Dakota statute, union and non-union members would be treated alike in determinations of unemployment compensation. The statute, in actual operation, allows employers to drive a pecuniary wedge into the collective bargaining process by unilaterally declaring a lockout and ceasing operations. This wedge cleaves labor in two ways: it forces union and non-union workers apart, one from the other; secondly, as has been seen, it divides union members from their union itself. The statute therefore gives employers a powerful ally in the form of the State and its largesse distributed through the Department of Labor. We hold these manipulations to be preempted.

*Remedy*

We then answer affirmatively *Brown's* question of whether "[Section 61–6–19] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." We conclude that South Dakota's administration of unemployment compensation benefits is preempted by Sections 7 and 8 of the NLRA. By altering the balance of power between labor and management, South Dakota has transgressed against Congress' concern to maintain the fine balance between labor and management. Further, South Dakota's shift in the balance of power occurs within the context of the strike, a tool receiving special protection under the NLRA and its interpreting caselaw.

As the above analysis indicates, the offensive aspect of South Dakota's benefit allocation is its differentiation between un-

8. *See supra* note 5.

ion and non-union members to the detriment of labor. The impact on the balance of power can be eliminated by prohibiting this differentiation. The Court therefore affirms the District Court's injunction, thereby preventing defendants from paying unemployment compensation benefits to non-union members left unemployed by a strike while denying those benefits to similarly incapacitated union members.

*Conclusion*

For the reasons stated above, the South Dakota Department of Labor's interpretation of S.D.Cod.L. 61–6–19 is preempted by Sections 7 and 8 of the National Labor Relations Act, 29 U.S.C. 157 and 158. The decision of the District Court in this matter is, accordingly, AFFIRMED.

FAGG, Circuit Judge, dissenting.

Even assuming the union has asserted a sufficiently tangible and causally connected injury to itself, *see Larson v. Valente,* 456 U.S. 228, 239, 102 S.Ct. 1673, 1680, 72 L.Ed.2d 33 (1982), or to its members, *see UAW v. Brock,* —— U.S. ——, ——, 106 S.Ct. 2523, 2527, 91 L.Ed.2d 228 (1986), to establish standing, and assuming further that a live case or controversy is presented by the union's action, *see Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 122–27, 94 S.Ct. 1694, 1698–1700, 40 L.Ed.2d 1 (1974), I cannot agree that South Dakota's application of its unemployment statute so undermines an employee's right to belong to a union that South Dakota should be permanently enjoined from "paying unemployment compensation benefits to non-union members left unemployed by a strike while denying those benefits to similarly incapacitated union members," *ante* at 410.

The broad sweep of the court's decision fails to recognize that this case does not represent the typical preemption situation in which state law, unanchored by federal policy or statute, can be invalidated solely on the strength of federal labor law policy. Rather, this case implicates not only federal policy in the area of labor law but also implicates important federal policy in the area of unemployment compensation.

Since 1937, when the constitutionality of Title IX of the Social Security Act was upheld by the Supreme Court, *Steward Machine Co. v. Davis,* 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937), the federal government, in partnership with the states, has worked to ease the financial burdens borne by the unemployed worker. As part of that cooperative endeavor, South Dakota has enacted a worker unemployment compensation program that fully complies with the requirements of federal unemployment compensation law. *See* 42 U.S.C. § 503.

Section 61–6–19 is a part of South Dakota's unemployment compensation program. Rather than assert that section 61–6–19 or the state's interpretation of it is inconsistent either with the requirements of the Social Security Act or South Dakota state law, the union contends the state's interpretation of section 61–6–19 interferes with rights guaranteed by section 7 of the National Labor Relations Act (NLRA), 29 U.S.C. § 157.

Section 7 of the NLRA, like the Social Security Act and the state programs enacted under it, is intended to advance important federal policies and in part guarantees employees the right to belong to a union. *Id.* Accepting for the sake of argument that South Dakota's actions had any impact on an employee's right to belong to a union, a proposition for which there is little record support, I believe that in the area of unemployment compensation this exercise of state power is a permissible one.

Except to the extent Congress has explicitly required or explicitly forbidden states from adopting a particular condition of unemployment compensation, "[t]he voluminous history of the Social Security Act ma[kes] it abundantly clear that Congress intended the several States to have broad freedom" to develop and implement those unemployment compensation policies best suited to the needs of each particular state. *See New York Telephone Co. v. New York State Department of Labor,* 440 U.S. 519, 536–37, 99 S.Ct. 1328, 1339, 59 L.Ed.2d 553

(1979) (plurality opinion); *Ohio Bureau of Employment Services v. Hodory*, 431 U.S. 471, 488–89, 97 S.Ct. 1898, 1908, 52 L.Ed.2d 513 (1977). Further, because the resulting diversity in state unemployment compensation programs is congressionally sanctioned, state policies not inconsistent with the Social Security Act, yet arguably interfering with rights protected by the NLRA, will not be preempted if the legislative history accompanying the Social Security Act as well as the legislative history accompanying the NLRA indicate that "Congress has decided to tolerate [this] interference." *New York Telephone Co.*, 440 U.S. at 549, 99 S.Ct. at 1345 (Blackmun, J., concurring); *see also Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 2395, 85 L.Ed.2d 728 (1985). At bottom, the fact that employees have exercised rights protected by the NLRA does not in and of itself necessarily deprive the state of its congressionally sanctioned authority to "decide whether or not to pay unemployment benefits." *Baker v. General Motors Corp. and Michigan Employment Security Commission*, — U.S. —, —, 106 S.Ct. 3129, 3137, 92 L.Ed.2d 504 (1986).

Here, the union does not assert that section 61–6–19 or the state's interpretation of it is in any way inconsistent with federal unemployment compensation policies. Further, the NLRA and its legislative history provide no support for the union's contention that the state's actions, while consistent with the requirements of the Social Security Act, have nevertheless been determined by Congress to constitute an impermissible interference with an employee's right to belong to a union.

Additionally, although the court focuses largely on the employee's right to belong to a union, the NLRA, in authorizing right-to-work laws such as South Dakota's, *see* 29 U.S.C. §§ 157, 164(b); *see also* S.D. Const. art. VI, § 2; S.D. Codified Laws Ann. §§ 60–8–3 to 60–8–6, obviously recognized that labor disputes would occur involving both union and non-union employees. *See New York Telephone Co.*, 440 U.S. at 544, 99 S.Ct. at 1343. As a result, states will be required to implement their unemployment compensation programs in situations such as this in which employees affected by a labor dispute have exercised both the right to belong to a union and the right not to belong to a union. *See* 29 U.S.C. § 157. Yet, while labor disputes like this one are clearly anticipated by the NLRA, the NLRA provides no indication that one of these rights is to be preferred over the other. More important, the NLRA gives no guidance to the states with respect to how the right to belong to a union and the right not to belong to a union are to be balanced with the myriad of other important federal and state policies underlying a state's unemployment compensation program.

Here, the court, without congressional guidance, has seen fit to reject the balance drawn by South Dakota in favor of the court's own position. The court has done this even though there is no suggestion that South Dakota's actions are inconsistent with either federal or state unemployment compensation policies.

In the absence of any congressional direction and in light of the state's strong, federally recognized interest in administering its own unemployment compensation program, I believe South Dakota should be allowed to administer its unemployment program as it has in this case. In any event, regardless of how South Dakota drew the balance in this case, the State's "power to fashion its own policy concerning the payment of unemployment compensation [should] not * * * be denied on the basis of speculation about the unexpressed intent of Congress." *New York Telephone Co.*, 440 U.S. at 545, 99 S.Ct. at 1343. At bottom, to the extent that South Dakota's actions may in some way interfere with an employee's right to belong to a union, I conclude this interference is of a type Congress has decided to tolerate.

I would reverse the decision of the district court and respectfully dissent from the decision of this court.